Beric Anthony Usher                              11/16/2021

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


GREAT LAKES INSURANCE S.E.,        CIVIL ACTION
                                   NO. 20-02795-SSV-DPC
                  Plaintiff
        VS.                        JUDGE SARAH S. VANCE

GRAY GROUP INVESTMENTS,            MAG. JUDGE
LLC,                               DONNA P. CURRAULT

                  Defendant




        The Zoom deposition of BERIC ANTHONY

USHER, taken in the above-entitled cause, before Jan

DiCicco, a Certified Court Reporter, given via

videoconference, commencing at 10:33 a.m. on the

16th day of November, 2021.

Perrien Proceedings

EXHIBIT "A"

1  Lakes?

2      A.   He was senior claims manager at Great Lakes.

3      Q.   Okay.   That's all the questions I have.

4  Thank you for your time today.

5  BY MR. CRAWFORD:

6      Q.   I just have a handful of questions.   Tony,

7  do you ever issue a policy of insurance without

8  having a hurricane plan received from the assured or

9  the insured?

10     A.   Not on a vessel remotely as big as this.   We

11 do occasionally on small center console boats, where

12 they're primarily hulled or stored on a trailer

13 anyway.   But nothing larger.

14     Q.   So if -- I know we talked earlier about the

15 navigational limits of the, of the policy.   If Gray

16 Group actually took the boat and parked it behind

17 the house of Michael Gray for the entirety of the

18 summer of 2020, is that complying with the hurricane

19 plan that they submitted to you guys?

20     A.   No.

21         MR. BAGOT:

22             Object to the form.

23 BY MR. CRAWFORD:

24     Q.   Why not?

25     A.   Because it's not in the same location and it

1  does not have the same plan.  It transpires the --

2  had the intention been to (indiscernible)

3          COURT REPORTER:

4              Wait, wait.  Had the intention --

5  BY MR. CRAWFORD:

6      Q.  Had the intention?

7      A.  Had the intention been that the insured

8  intended to store the vessel throughout the

9  hurricane season at a private dock in Pensacola,

10 then we would have required a completely different

11 hurricane plan.

12     Q.  And under the existing plan, if they took

13 the boat somewhere other than New Orleans or south

14 Florida on a temporary journey, which I don't

15 believe this could be represented to be one, would

16 you still expect them to take steps to evacuate it

17 from harm's way?

18         MR. BAGOT:

19              Object to the form of the question.

20 BY MR. CRAWFORD:

21     Q.  You can answer.

22     A.  If the vessel was (indiscernible)

23         COURT REPORTER:

24              If the what?

25         THE WITNESS:

 1          Vessel was cruising, then it will be
 2   fully manned, in terms of fully crewed.  This vessel
 3   is more than capable of cruising at twenty-five
 4   knots plus.  Right?  As a consequence, it could
 5   easily move out of the path of any storm.
 6      Q.  And is the failure to move the vessel out of
 7   the path of the storm a deficiency in terms of
 8   complying with the hurricane plan in your opinion?
 9      A.  Yes.  Inasmuch as had we been aware of the
10   change of location (indiscernible)
11      Q.  You have to repeat, Tony.  You dropped off.
12      A.  If we had been aware of where the vessel was
13   going to be located throughout the hurricane season,
14   then we would need a plan, set plan as to how you
15   were going to evacuate the vessel or protect the
16   vessel in the event of an impending storm.  What we
17   have, this vessel was incapable of evacuating and
18   moved in a protected area at the time of the storm,
19   which is in direct contravention of the hurricane
20   plan that was submitted in order to obtain
21   insurance.
22      Q.  Now, does the hurricane plan itself indicate
23   that it will be incorporated into any policy of
24   insurance?
25      A.  Yes.  The questionnaire has in bold a

1  warning at the bottom stating that it will be

2  incorporated into the (indiscernible).  The reason

3  why we insist (indiscernible)

4           COURT REPORTER:

5               I'm sorry.  The reason why we insist?

6           THE WITNESS:

7               On our questionnaire being completed as

8  opposed to just a hurricane plan on a blank piece of

9  paper.  It must be on our form because our form has

10 that specific alert, specific warning.  So you'll

11 find in the underwriting form the previous year,

12 they submitted a hurricane plan that was just on

13 plain paper that was not accepted.  The plan itself

14 was okay, but we would only accept it if it was on a

15 Concept Special Risks hurricane questionnaire/plan.

16 BY MR. CRAWFORD:

17    Q.  Now, the, counsel asked you questions about

18 specific language in the policy itself.  Do you

19 agree that the policy terms and conditions speak for

20 itself?

21    A.  Yes.

22    Q.  Okay.  And there are, there's one place in

23 the policy where it refers to a hurricane form and

24 then there's another place in the policy -- excuse

25 me.  There's one place in the policy where it refers

Beric Anthony Usher                           11/16/2021

1  to an application form, and then there's another

2  place in the policy where it refers to your

3  application in full.  Are those different terms?  A

4  form versus application?

5          MR. BAGOT:

6              Object to the form.

7          THE WITNESS:

8              The application for insurance includes

9  all the information that we (indiscernible)

10 BY MR. CRAWFORD:

11     Q.  You're going to have to repeat that, Tony.

12     A.  The application process (indiscernible) and

13 all the representations made in order to secure the

14 insurance.  So as a consequence, the entire

15 representation of the assured is embodied into the

16 policy.

17     Q.  And does that include the hurricane

18 questionnaire and attached plan?

19     A.  Yes.

20     Q.  No further questions.

21 BY MR. BAGOT:

22     Q.  Mr. Usher, when we talked earlier, I think

23 you indicated that the application form and the

24 application is no indication in the policy that

25 indicates that those are, are different documents.

Beric Anthony Usher                          11/16/2021

1   Is that correct?
2        A.   Can you repeat the question?
3        Q.   I think you testified earlier that there's
4   no reference in the policy that describes the
5   application form signed by you and the term
6   application which is used later in the policy as
7   being different.  Did you not testify to that?
8             MR. CRAWFORD:
9                  Object to the form.  You can answer.
10            THE WITNESS:
11                 The policy document does not
12   specifically refer to (indiscernible)
13   BY MR. BAGOT:
14       Q.   Sir?
15       A.   Is part of the application process.
16       Q.   Well, my question is, did you not admit
17   earlier that the policy does not state that the
18   application form and the application for insurance
19   meant or referred to different things?
20            MR. CRAWFORD:
21                 Object to the form.
22            THE WITNESS:
23                 The entire thing is part and parcel of
24   the application.  If you look at the policy, it will
25   state that this incorporates -- God.  My computer

Beric Anthony Usher                               11/16/2021

1   just got (indiscernible).  It should state in the

2   policy that all the representations that are made by

3   the insured for (indiscernible) become part of the

4   policy.  Whether it is stated on the application

5   form or supplementary letter or supplementary list

6   or hurricane questionnaire or operator

7   questionnaire, named operator background, criminal

8   background, all the information we request is

9   imparted into the policy.

10  BY MR. BAGOT:

11     Q.  Okay.  Object to the responsiveness.  Did

12  you testify earlier today that the policy does not

13  state that the application form and the application

14  for insurance means or refers to different

15  documents?

16          MR. CRAWFORD:

17              Same objection.  You can answer again.

18          THE WITNESS:

19              (Indiscernible)

20          COURT REPORTER:

21              I didn't hear you.

22          THE WITNESS:

23              (Indiscernible)

24          COURT REPORTER:

25              I still didn't hear you.  I'm sorry.

1        THE WITNESS:

2             (Indiscernible) did not state that.

3   BY MR. BAGOT:

4      Q.  All right.  Now, I want to ask you a

5   question about the hurricane plan, some of your

6   earlier testimony in response to Mr. Crawford's

7   question.  Were you aware that a request was sent

8   some five months before, less than five months

9   before this loss by Arthur J. Gallagher regarding

10  the navigation of the vessel, the vessels, the Hello

11  Dolly VI and VII, away from their permanent, away

12  from their mooring locations as set forth in the

13  policy to other areas within the covered, within the

14  navigational limits and that Alex Thomas of your

15  office responded, quote, I think we have been

16  through this before.  The principle of main mooring

17  location -- please see attached.  The principle of

18  main mooring location but with, quote, visitation

19  rights, closed quote, as it were has not changed.  I

20  am not sure where they are copying the navigation

21  from in their email below, but there is no

22  permission to be in Bermuda.

23             So you're not denying that The Gray Group

24  had the right to navigate anywhere it wanted to

25  within the navigational limits of the policy, is