UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GREAT LAKES INSURANCE, S.E.                      CIVIL ACTION

VERSUS                                                    NO. 20-2795

GRAY GROUP INVESTMENTS, LLC              SECTION "R" (2)


## ORDER AND REASONS

Before the Court are cross-motions for summary judgment by plaintiff Great Lakes Insurance, S.E. ("Great Lakes")[1] and defendant and counter-claimant Gray Group Investments, LLC ("Gray Group").[2]  For the following reasons, the Court grants Great Lakes's motion for summary judgment, and denies Gray Group's motion for summary judgment.


I.    **BACKGROUND**

This case arises out of a dispute over insurance coverage of a yacht that sustained damage during Hurricane Sally.  The insurance policy at issue provided that Great Lakes would insure Gray Group's yacht, the HELLO DOLLY VI, from January 1, 2020, through January 1, 2021.[3]

---

[1]    R. Doc. 126.
[2]    R. Doc. 119.
[3]    R. Doc. 119-4 at 1 (Policy).

Before the start of coverage, Gray Group completed and signed an "Application Form" provided by Great Lakes.[4]  The Form names the insured vessel as the HELLO DOLLY VI, and denotes a policy year of 2020.[5]  The Form also provides that the vessel's primary mooring location between July 1 and November 1 will be the Orleans Marina.[6]  The Form further provides that "[t]his application will be incorporated in its entirety into any relevant policy of insurance where insurers have relied upon the information contained therein."[7]  The Application Form is signed by Louis S. Crews, Jr., Gray Group's "Fleet Risk Manager," and is dated October 11, 2019.[8]

On the same day, Gray Group also completed and signed an insurer-provided "Hurricane Questionnaire/Plan."[9]  The Questionnaire/Plan, like the Application Form, provides that the HELLO DOLLY VI will be moored at the Orleans Marina between July 1 and November 1 of the policy year.[10] The Questionnaire also instructs the insured to "provide full details of [its]

---

[4]     R. Doc. 119-2 (Application Form).
[5]     *Id.* at 1.
[6]     *Id.* at 2.
[7]     *Id.* at 4.
[8]     *Id.*
[9]     R. Doc. 119-3 (Hurricane Questionnaire/Plan).
[10]    *Id.* at 1.

plan for protecting the vessel in the event of any storm warning."[11]   Gray

Group's response to that question provides:

> Between 120 and 72 hours prior to landfall of a Hurricane that may threaten vessel's dockage at Orleans Marina, vessel will be fully manned in the event evacuation becomes necessary.  As storm tract becomes clearer, decision will be made to move to safe harbor by heading north up river, east to Florida or west to Texas.  At cruising speed, vessel has a cruising range in excess of 2,000 nautical miles, making safe harbor well within reac[h.] Vessel[']s fuel tanks will be topped off following all trips so that should evacuation become necessary, fueling will not be an issue. . . . If in South Florida, HD VI will be taken to Ro[s]cioli Shipyard.  In either scenario, the vessel will be cris[s]crossed with lines so as to allow sufficient scope, surrounded by fenders and her anchor dropped.  Generators will be run to avoid a power surge via shore power.  All external cushions and canvas that can be removed will be removed and stored.[12]

Above the signature line, the Questionnaire/Plan states that "[i]t is hereby

warranted that in the event of a named or numbered storm warning or

advisory issued by any competent local authority, [Gray Group] will secure

the above vessel and/or its equipment in accordance with the

representations stated above . . . ."[13]  The Questionnaire/Plan further states

that the insured "agree[s] that this declaration and warranty shall be

incorporated in its entirety into any relevant policy of insurance."[14]  The

---

[11]   *Id.*
[12]   *Id.* at 2.
[13]   *Id.* at 1.
[14]   *Id.*

3

Questionnaire/Plan, like the Application Form, is signed by Louis S. Crews, Jr. and is dated October 11, 2019.[15]

Under the insurance agreement (the "Policy"), the hull of the HELLO DOLLY VI is insured for up to $1,900,000, with a $228,000 named-windstorm deductible.[16]   The Policy states that the insurer will "provide coverage for accidental physical loss of or damage to the Scheduled Vessel which occurs during the period of this insuring agreement . . . , subject to the insuring agreement provisions, conditions, warranties, deductibles and exclusions."[17]   Under the heading "General Conditions & Warranties," the Policy provides: "This insuring agreement incorporates in full your application for insurance and[,] together with any endorsements issued herein, constitutes the entire contract between us."[18]   The warranties section further states:

> Where any term herein is referred to as a "warranty" or where any reference is made herein to the word "warranted," the term shall be deemed a warranty and regardless of whether the same expressly provides that any breach will void this insuring agreement from inception, it is hereby agreed that any such breach will void this policy from inception.[19]

---

[15]   *Id.*

[16]   R. Doc. 119-4 at 1 (Policy).

[17]   *Id.* at 5.

[18]   *Id.* at 12.

[19]   *Id.* at 14.

The Policy also contains a choice-of-law provision, which provides:

> [A]ny dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice, but where no such well established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the State of New York.[20]

In the spring of 2020, the HELLO DOLLY VI was moved from the Orleans Marina to the Roscioli Shipyard in Fort Lauderdale, Florida.[21]  On July 19, 2020, the vessel was moved to Pensacola, Florida, and moored at the home of Michael Gray, a member of Gray Group, LLC.[22]  The vessel remained moored at Michael Gray's home until mid-September 2020, when Hurricane Sally began approaching the Gulf Coast, including Pensacola.

At 4:00 a.m. on September 13, 2020, approximately 73 hours before Hurricane Sally's eventual landfall,[23] the National Hurricane Center issued Advisory No. 7, placing a tropical storm warning over the area from Ocean

---

[20]   *Id.* at 16.

[21]   R. Doc. 119-5 at 10 (Deposition of Michael Gray at 17:5-9); R. Doc. 119-6 ¶ 3 (Declaration of Michael Townsend Gray).

[22]   R. Doc. 119-5 at 9 (Deposition of Michael Gray at 16:14-24); R. Doc. 119-6 ¶ 4 (Declaration of Michael Townsend Gray).

[23]   The National Hurricane Center reported that the eye of the storm made landfall near Gulf Shores, Alabama, at 4:45 a.m. on September 16, 2021.  R. Doc. 126-9 at 5 (Hurricane Sally Advisories Issued by the National Hurricane Center).

Springs, Mississippi, to Indian Pass, Florida.[24]  Pensacola sits near the center of this stretch.  At no time did Gray Group move the vessel from its mooring in Pensacola.[25]  Michael Gray testified that he watched the weather closely, and on the night of September 14, he, his brother, and a friend "adjust[ed] a few lines," and "may have . . . put on one or two more."[26]  He testified that, the following morning, the group "adjust[ed] lines," but "were happy with the way everything else was working out," and did nothing else to prepare for the impending storm.[27]  At 11:47 p.m. on the night of September 15, the vessel sustained significant damage from the storm, and sank at its mooring in Pensacola.[28]

After the hurricane, Gray Group filed a claim with Great Lakes, claiming a total loss of the vessel.[29]  On October 13, 2020, Great Lakes denied coverage on the grounds that Gray Group had breached certain warranties under the Policy.[30]

---

[24]   *Id.* at 2; R. Doc. 119-9 at 50 (National Hurricane Center Tropical Cyclone Report, Hurricane Sally) (Apr. 14, 2021).

[25]   *See* R. Doc. 119-5 at 36 (Deposition of Michael Gray at 61:16).

[26]   *Id.* at 46 (Deposition of Michael Gray at 77:1-4).

[27]   *Id.* (Deposition of Michael Gray at 77:5-15).

[28]   R. Doc. 119-12 ¶ 20 (Gray Group's Statement of Uncontested and Established Facts).

[29]   R. Doc. 126-12 at 1 (Letter from Todd Crawford to Michael Bagot) (Oct. 13, 2020).

[30]   *Id.* at 1-4.

On October 13, 2020, Great Lakes filed suit in this Court, seeking a declaratory judgment that the insurance policy covering the HELLO DOLLY VI was void.[31]   Specifically, Great Lakes alleged that Gray Group was in breach of the Policy because the vessel was not moored at the Orleans Marina, was not fully manned, was not evacuated to safe harbor, and did not have its anchor deployed.[32]   Gray Group filed cross-claims, seeking coverage for the HELLO DOLLY VI under the Policy.[33]

On November 16, 2021, Great Lakes and Gray Group each moved for summary judgment.[34]   Gray Group argues that the undisputed facts establish that the loss of the HELLO DOLLY VI is covered under the Policy, and Great Lakes argues the opposite.   Each party opposes the other's motion.[35]   The Court considers the parties' motions below.

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v.*

---

[31]   R. Doc. 1 (Complaint); R. Doc. 20 ¶¶ 13-18 (Amended Complaint).
[32]   R. Doc. 20 ¶ 15 (Amended Complaint).
[33]   R. Doc. 17 (Gray Group's Answer and Cross-Claims).
[34]   R. Docs. 119 & 126.
[35]   R. Docs. 135 & 140.

*Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075.  "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. v. Lease*, 755 F. Supp. 948,

951 (D. Colo. 1991)).  "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  (quoting *Celotex*, 477 U.S. at 322)).

## III.   DISCUSSION

### A.   New York Law

In a previous Order and Reasons, this Court held that, because of a valid choice-of-law clause in the Policy,[36] interpretation of the Policy is governed by New York law.[37]   Under New York law, courts interpreting the terms of an insurance contract must "give effect to the intent of the parties as expressed in the clear language of the contract." *Morgan Stanley Grp., Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (quoting *Vill. of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995)).   As part of the threshold interpretive inquiry, the Court must determine "whether the terms of the insurance contract are ambiguous."   *Id.* (citing *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998)).   A term is ambiguous if it "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."

---

[36]   R. Doc. 119-2 at 17 (Policy).

[37]   *See Great Lakes Ins., S.E. v. Gray Grp. Invs.*, LLC, ___ F. Supp. 3d ___, No. 20-2795, 2021 WL 3124495, at *4 (E.D. La. July 23, 2021) (Vance, J.).

*Sarinsky's Garage, Inc. v. Erie Ins. Co.*, 691 F. Supp. 2d 483, 486 (S.D.N.Y. 2010) (quoting *Morgan Stanley*, 225 F.3d at 275) (applying New York contract law to an insurance agreement).  If the "language is unambiguous, the court will discern the parties' intent from the document itself as a matter of law." *Jefferson Block 24 Oil & Gas, L.L.C. v. Aspen Ins. UK Ltd.,* 652 F.3d 584, 589 (5th Cir. 2011) (applying New York law).  Further, "[i]t is well established under New York law that a policyholder bears the burden of showing that the insurance contract covers the loss." *Morgan Stanley*, 225 F.3d at 276.

If the court finds that any terms of the contract are ambiguous, "the burden shifts to the insurer to prove that its proposed interpretation of the policy is the correct one." *Jefferson Block,* 652 F.3d at 589 (citing *Morgan Stanley*, 225 F.3d at 276).  At this stage, "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Id.* (quoting *Morgan Stanley*, 225 F.3d at 275-276); *see also Alexander & Alexander Servs.*, 136 F.3d at 86; *XL Specialty Ins. Co. v. Level Glob. Invs., L.P.*, 874 F. Supp. 2d 263, 281 n.11 (S.D.N.Y. 2012) (quoting *State v. Home Indem. Co.*, 486 N.E.2d 827 (N.Y. 1985)).  "If the extrinsic evidence is 'so one-sided that no reasonable person could decide the contrary,' the court may resolve the ambiguity as a matter

of law." *Jefferson Block*, 652 F.3d at 589 (quoting *Sarinsky's Garage*, 691 F. Supp. 2d at 486).  Otherwise, "the extrinsic evidence must be interpreted by the factfinder." *Id.*  "Where the ambiguity cannot be resolved by examining extrinsic evidence of the parties' intentions—either as a matter of law or as a matter of fact—the court should construe the ambiguous language . . . against the insurer." *Sarinsky's Garage*, 691 F. Supp. 2d at 486.

Here, the parties dispute whether the Policy incorporates the Hurricane Questionnaire/Plan, and whether the terms of that Questionnaire/Plan were breached.  Gray Group contends that the Hurricane Questionnaire/Plan is not part of the Policy, and that in any case, its terms were not breached.[38]  Great Lakes, on the other hand, contends that the Hurricane Questionnaire/Plan is a warranty under the Policy, and that its terms were breached.[39]  Below, the Court considers (i) whether the Hurricane Questionnaire/Plan forms part of the Policy, (ii) whether Gray Group breached the Hurricane Questionnaire/Plan, and, if so, (iii) the effect of the breach.

---

[38]    *See* R. Doc. 119-1.

[39]    *See* R. Doc. 126-1.

### B.   Whether the Hurricane Questionnaire/Plan Forms Part of the Policy

The crux of the parties' dispute is the Policy's provision that the agreement "incorporates in full [Gray Group's] application for insurance."[40] Great Lakes and Gray Group dispute whether this provision includes the Hurricane Questionnaire/Plan that Gray Group is alleged to have breached.

The Court has analyzed this provision before.  In a previous Order and Reasons denying Gray Group's motion for judgment on the pleadings,[41] the Court found that both of the parties' proposed interpretations found support in the 12(c) record.  Those considerations remain highly relevant at this stage.  As to Gray Group's asserted meaning, the Court observed as follows:

> Gray Group contends that the "application for insurance" includes only the Application Form.  This is a plausible interpretation.  Other than the insurance agreement, the only document before the Court bearing the word "application" is the Application Form.  The Hurricane Questionnaire/Plan does not contain the word "application," nor otherwise state that it is part of the "application for insurance."  These circumstances favor [Gray Group]'s reading of the contract.[42]

As to Great Lakes's asserted meaning, the Court found significantly more support in the 12(c) record.  The Court explained, and here reiterates and reincorporates, the following:

---

[40]   R. Doc. 119-4 at 12 (Policy).

[41]   *Great Lakes Ins., S.E.*, 2021 WL 3124495.

[42]   *Id.* at *5 (citations omitted).

The contract's use of the words "in full" favors an expansive reading of the material to be incorporated. Furthermore, a comparative review of the Application Form and Hurricane Questionnaire/Plan suggests that the two documents were completed and submitted as one item. They were signed by the same person and bear the same date. They both correspond to the HELLO DOLLY VI, with a policy period of January 1, 2020 to January 1, 2021. They are both insurer-provided forms. And they both specify that the vessel is to be moored at the Orleans Marina from July 1 to November 1. Most significantly, *the Hurricane Questionnaire/Plan expressly provides that it will be incorporated into the insurance agreement.* [Gray Group]'s representative signed directly beneath this clause. These circumstances support [Great Lakes]'s assertion that the Hurricane Questionnaire/Plan is part of the application and, accordingly, the insurance agreement.[43]

Ultimately, the Court held that the Policy's "incorporat[ion] in full [of] [Gray Group's] application for insurance" could "suggest more than one meaning when viewed objectively by a reasonably intelligent person." *Sarinsky's Garage, Inc.*, 691 F. Supp. 2d at 486.[44] The Court therefore found that the meaning of the provision was ambiguous.[45] Having found ambiguity, the court could then "accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Jefferson Block,* 652 F.3d at 589 (citing *Morgan Stanley*, 225 F.3d at 276). But, confined to the 12(c) record, the Court found that material facts

---

[43]    *Id.* (emphasis added) (citations omitted).

[44]    *Id.* at *6.

[45]    *Id.*

remained in dispute as to the parties' intended meaning, and did not resolve the ambiguity.[46]

At, this stage, the Court has the benefit of the summary-judgment record.  And in looking to the extrinsic evidence contained in that record, the meaning of the contested provision becomes clear.

First, Beric Anthony Usher, the CEO and Senior Underwriter of Great Lakes's underwriting agent, attested in two sworn declarations and in his deposition that the Hurricane Questionnaire/Plan forms part of the application and/or the Policy.  In a declaration dated May 30, 2021, Usher described the application process that Gray Group was required to complete to procure insurance, and stated that, "[i]ncluded in the Application process for Gray Group was a requirement to provide ... Hurricane Questionnaire/Plans and Hurricane Protection Plans."[47]  Usher further attested that, as to the contents of the Questionnaire/Plan, the underwriters "relied upon the information provided by Gray Group as to the permanent location of the Scheduled Vessel, expected movement of the Vessel to a safe harbor when a named storm might approach, and the expected mooring of the Vessel when a named storm approached."[48]  In a second sworn

---

[46]    *Id.*
[47]    R. Doc. 25-1 at 1 (Declaration of Beric Anthony Usher) (May 30, 2021).
[48]    *Id.* at 2.

declaration, dated November 2, 2021, Usher stated that "[t]he application and the Hurricane Questionnaire/Plan are expressly incorporated into the policy."[49]  In his deposition, Usher testified that "the entire representation of the assured is embodied into the policy," and that this "include[s] the hurricane questionnaire and attached plan."[50]  These sworn statements by the CEO and Senior Underwriter of the underwriting agent on the Policy strongly suggest that the Policy's statement that it "incorporates in full [Gray Group's] application for insurance" includes the Hurricane Questionnaire/Plan.

Second, Gray Group's Fleet Risk Manager, Louis S. Crews, Jr., shared this understanding.  At his deposition, Crews was asked about the Hurricane Questionnaire/Plan, which he signed.  Specifically, Crews was asked if he understood that the Questionnaire/Plan's statement that the "declaration and warranty shall be incorporated in its entirety into any relevant policy of insurance," meant that the Questionnaire/Plan would be incorporated in its entirety into the Policy.[51]  Crews responded, "*I understand that it would be incorporated into the policy*."[52]   The Court finds that the personal

---

[49]   R. Doc. 126-6 at 2 (Declaration of Beric Anthony Usher) (Nov. 2, 2021).
[50]   R. Doc. 146-1 at 6 (Deposition of Beric Anthony Usher at 90:14-19).
[51]   R. Doc. 140-1 at 13 (Deposition of Louis S. Crews, Jr. at 25:11-17).
[52]   *Id.* (Deposition of Louis S. Crews, Jr. at 25:18-19) (emphasis added).

understanding of Crews—the very person who signed the document—that the Hurricane Questionnaire/Plan would be incorporated into the Policy, is highly persuasive in ascertaining the meaning of the Policy's incorporation provision.

Third, email correspondence among the parties' agents during prior policy years further convinces the Court that the Hurricane Questionnaire/Plan forms part of the application for insurance and, in turn, the Policy.   For example, on May 17, 2017, underwriters notified Gray Group's agents that coverage of the HELLO DOLLY VI would expire in 15 days, and that certain information and documentation remained outstanding.[53]  That information included the signed and dated Application Form, as well as the "Hurricane Plan."[54]  A week later, on May 25, 2017, underwriters wrote again, this time marking the communication "URGENT," and stating that the Hurricane Plan remained outstanding, that it was required by June 1, 2017, and that, "[f]ailing receipt[,] coverage is declared void from inception."[55]  The next day, Gray Group submitted the Hurricane

---

[53]   R. Doc. 25-1 at 5 (Email from Alex Thomas to Kyra Barker) (May 17, 2017).

[54]   *Id.*

[55]   *Id.* at 6 (Email from Alex Thomas to Simon Fox) (May 25, 2017).

Questionnaire/Plan.[56]  This exchange suggests that Gray Group understood that the Hurricane Questionnaire/Plan was part of the application for insurance.

The same issue arose two years later.  On January 23, 2019, Gray Group's broker was informed that the Hurricane Plan remained outstanding, and that the Hurricane Questionnaire/Plan must "be signed and dated *as it forms part of the policy*."[57]  On January 28, 2019, Great Lakes's underwriters notified Gray Group's agent that the Hurricane Plan remained outstanding, and that, "[f]ailing receipt[,] coverage is declared void from inception."[58]  A week later, underwriters wrote again, stating that the Hurricane Plan remained outstanding, and that coverage had expired two days prior.[59]  Hours later, Gray Group submitted the Plan.[60]

This evidence makes clear that the Hurricane Questionnaire/Plan is a critical component of Gray Group's application for insurance for the HELLO DOLLY VI.  And this interpretation is consistent with the expansive language

---

[56]    *Id.* at 7 (Email from Dieter Michael Hugel to Simon Fox, et al.) (May 26, 2017).

[57]    R. Doc. 126-5 at 1 (Email from Kyra Clifford to Dieter Michael Hugel, et al.) (Jan. 23, 2019) (emphasis added).

[58]    R. Doc. 25-1 at 30 (Email from Alex Thomas to Kyra Clifford) (Jan. 28, 2019).

[59]    *Id.* at 31 (Email from Kathy Smith to Alexander Simpson & Kyra Clifford) (Feb. 4, 2019).

[60]    *Id.* at 32.

of the Policy itself, which provides that it "incorporates in full" the application for insurance,[61] as well as the Hurricane Questionnaire/Plan's explicit statement that the document "shall be incorporated in its entirety" into the Policy.[62]  Because the evidence is "so one-sided that no reasonable person could decide the contrary," the Court resolves the Policy's ambiguity as a matter of law.  *Jefferson Block*, 652 F.3d at 589 (quoting *Sarinsky's Garage*, 691 F. Supp. 2d at 486).  The Court finds that, by "incorporat[ing] in full" Gray Group's "application for insurance," the Policy insuring the HELLO DOLLY VI for policy year 2020 incorporates the Hurricane Questionnaire/Plan that was signed and submitted by Gray Group on October 11, 2019.

Gray Group asserts that the Hurricane Questionnaire/Plan does not form part of the Policy because, under New York law, for a writing to be incorporated by reference into another instrument, the instrument must "identify the referenced document beyond all reasonable doubt."[63]  *See Shark Info. Servs. Corp. v. Crum & Forster Com. Ins.*, 634 N.Y.S.2d 700, 701 (App. Div. 1995).  While this is true of New York law, that standard is satisfied here.  For the reasons stated above, the Court has found, as a matter of law,

---

[61]    R. Doc. 119-4 at 12 (Policy).
[62]    R. Doc. 119-3 at 1 (Hurricane Questionnaire/Plan).
[63]    R. Doc. 119-1 at 15.

that the Policy's incorporation provision includes the Hurricane Questionnaire/Plan as part of the application for insurance.  The Hurricane Questionnaire/Plan is therefore adequately identified for the purposes of incorporation by reference.  *See Pool Deals, LLC v. United Parcel Serv., Inc.*, 454 F. Supp. 3d 208, 214 (W.D.N.Y. 2020) ("Courts may decide whether a document is incorporated by reference as a matter of law, even if the parties urge contrary interpretations." (citing *Pagaduan v. Carnival Corp.*, 709 F. App'x 713, 715 (2d Cir. 2017))).

Furthermore, New York's "exacting standard" for incorporation by reference serves to put the contracting parties on notice of all the terms to which they are assenting.  *See Kenner v. Avis Rent A Car Sys., Inc.*, 678 N.Y.S.2d 213, 214 (App. Div. 1998) (asking whether an "oblique reference in the [contract] to an otherwise unidentified 'rental document jacket' meets [the] exacting standard [for incorporation by reference] . . . and thus whether the [contract] signed by plaintiff gave him sufficient notice of the . . . contents of the separate jacket").  Here, there is no concern regarding notice.  Gray Group itself filled out the Hurricane Questionnaire/Plan, and thereby generated its terms.  Gray Group read, signed, and dated the Questionnaire/Plan.  Above the signature line, the Questionnaire/Plan states in bold print that the document "*shall be incorporated in its entirety*" into

the relevant policy of insurance.[64]   This bolded section bears a header reading, "WARNING."[65]  Gray Group signed the Questionnaire/Plan on the same day as its Application Form, and in turn received an insurance agreement "incorporat[ing] in full" Gray Group's "application for insurance."[66]  Accordingly, Gray Group had more than "sufficient notice of . . . the contents" of the Hurricane Questionnaire/Plan.  The Court finds that the Policy's incorporation of a document well known to the parties as part of the application process satisfies the New York standard.

Having determined that the Hurricane Questionnaire/Plan forms part of the Policy, the Court proceeds to determine whether Gray Group breached its terms and, if so, the effect of such a breach.

### C.    Breach of the Hurricane Questionnaire/Plan

The Hurricane Questionnaire/Plan provides that the "marina or residence where [the] vessel is located between 1st [of] July and 1st of November" is the Orleans Marina.[67]  To determine whether this provision has been breached, the Court must interpret its meaning.  As a threshold

---

[64]    R. Doc. 119-3 at 1 (Hurricane Questionnaire/Plan).
[65]    *Id.*
[66]    R. Doc. 119-4 at 12 (Policy).
[67]    R. Doc. 119-3 at 1 (Hurricane Questionnaire/Plan).

matter, the use of the words "marina or residence" indicates that the provision refers to the vessel's location when moored, and does not require that the vessel literally remain in place at the Orleans Marina for the entirety of the season.  In other words, the vessel may depart from the Orleans Marina during this period.

Having so determined, the Court finds that this location provision is still susceptible of multiple reasonable meanings.  On the one hand, the provision could mean that, at any point when the vessel is moored, it must be moored at the Orleans Marina.  Alternatively, the provision could mean that the vessel must spend the majority of its mooring time during this four-month period at the Orleans Marina.  Under this interpretation, more than half of the HELLO DOLLY VI's mooring time would have to be at the Orleans Marina.  Accordingly, the location provision in the Hurricane Questionnaire/Plan could "suggest more than one meaning when viewed objectively by a reasonably intelligent person." *Sarinsky's Garage, Inc.*, 691 F. Supp. 2d at 486.  The term is therefore ambiguous.

Having decided that the meaning of this provision is ambiguous, "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Jefferson Block,* 652 F.3d at 589 (citing *Morgan Stanley*, 225 F.3d at 276).  The Court

finds that, in looking to the extrinsic evidence, the meaning of the term becomes clear.  Specifically, email correspondence among agents of the parties indicates that this location provision refers to the vessel's location for the majority of hurricane season, which determines the risk and associated premium under the Policy.

For example, on January 23, 2019, a broker corresponding on behalf of Great Lakes wrote the following to an agent of Gray Group, regarding the HELLO DOLLY VII,[68] another yacht owned by Gray Group and insured by Great Lakes:

> Please confirm if during the period 1st July – 1st November the vessel will be in the Bahamas or Florida.  Underwriters have quoted this risk on the basis that during the windstorm season, the vessel will be in Mississippi[69] which effectively reduces the risk in their eyes.  If the vessel will be in Florida or the Bahamas etc[.], Underwriters will need to know now so that they can properly rate this and apply the correct premium.[70]

---

[68]   No party contends that the forms used for the HELLO DOLLY VII differ in any respect from the documents governing coverage of the HELLO DOLLY VI.  Nor does any party contend that the documents from prior years differ from the 2020 documents.

[69]   The HELLO DOLLY VII was to be moored in Pass Christian, Mississippi, while the HELLO DOLLY VI was to be moored in New Orleans.  R. Doc. 135-3 at 3 (Email from Toni Bazer to Dieter Hugel) (Apr. 24, 2020).

[70]   R. Doc. 126-5 at 1 (Email from Kyra Clifford to Dieter Hugel) (Jan. 23, 2019).

Similarly, on May 8, 2019, Gray Group's broker sent the following inquiry to Great Lakes's underwriting agent, regarding the HELLO DOLLY VII:

> [A]ssured is under impression that they cannot go to Florida or [the] Bahamas once Hurricane Season begins.  The previous policy did not charge an [additional premium] to go to either Florida or the Bahamas.  This is what assured wants to be able to do—go to Florida and [the] Bahamas during hurricane season. I look forward to your further advices.[71]

On May 9, 2019, Great Lakes's underwriting agent responded, explaining that Gray Group's

> application form showed that their mooring location during July to November would be Mississippi[,] and [the underwriters] rated the risks as such.  If they change their mooring location to [the] Bahamas for the majority of the hurricane season then this must be re-rated. *We rate on the assumption of where the vessel will be for the majority of the season.*[72]

After noting that "the assured has permission to *visit* all the areas within their navigation limits during the hurricane season,"[73] the underwriting agent further explained that "[i]f they will spend the majority of that season

---

[71] R. Doc. 25-1 at 27-28 (Email from Dieter Hugel to Alexander Simpson) (May 8, 2019).

[72] *Id.* at 27 (Email from Alex Thomas to Alexander Simpson) (May 9, 2019) (emphasis added).

[73] *Id.* (emphasis in original).

24

in Mississippi then the premium can stay the same," but "if they relocate to the Bahamas for that period there will be an [additional premium] to pay."[74]

A similar exchange happened one year later. On April 23, 2020, Gray Group's broker wrote to the underwriters, saying that the HELLO DOLLY VI will be "navigating to the Florida Keys this particular trip," and that "it will then go on to the Bahamas."[75] The underwriter wrote that "Florida is already included in the navigation limits," but that "[i]f they wish to amend the mooring location during the hurricane season[,] please provide the full address and we will quote any premium increase."[76]

These communications collectively indicate that the Hurricane Questionnaire/Plan's provision regarding the "marina or residence" where the vessel would be located between July 1 and November 1 refers to where the vessel would be moored for the majority of that period. This interpretation is consistent with the importance of the vessel's location to the underwriters. The record establishes that the HELLO DOLLY VI's location for the majority of the hurricane season affected the underwriters' assessment of the risk and determination of the premium. As attested in a

---

[74]   *Id.*

[75]   R. Doc. 135-3 at 1 (Email from Alexander Simpson to Alex Thomas) (Apr. 23, 2020).

[76]   *Id.* (Email from Alex Thomas to Alexander Simpson) (Apr. 23, 2020).

sworn declaration by Beric Anthony Usher, the underwriters of the Policy "rel[y] upon the information provided in the application when making an underwriting decision."[77]   That information includes the vessel's mooring location during the hurricane season, reported by Gray Group to be the Orleans Marina.[78]

Gray Group contends that the Orleans Marina is merely the vessel's "home port."[79]   But it submits no evidence in support of this interpretation. The term "home port" appears nowhere in the Hurricane Questionnaire/Plan.   Likewise, "home port" appears nowhere in the parties' email correspondence, which addresses the location provision on multiple occasions.   The evidence in the record instead indicates that Hurricane Questionnaire/Plan's location provision refers to where the vessel will actually spend the majority of its time during hurricane season.

Because the extrinsic evidence is "so one-sided that no reasonable person could decide the contrary," the Court "resolve[s] the ambiguity as a

---

[77]   R. Doc. 126-6 at 2 (Declaration of Beric Anthony Usher) (Nov. 2, 2021).

[78]   R. Doc. 25-1 at 2 (Declaration of Beric Anthony Usher) (May 30, 2021).

[79]   R. Doc. 135 at 9-10; *see also* R. Doc. 119-6 ¶ 5 (Declaration of Michael Townsend Gray); R. Doc. 135-2 at 5 (Deposition of Louis S. Crews, Jr. at 26:2-7) ("You understand that [Great Lakes's underwriting agent] wanted to know where the vessel was going to be during hurricane season; correct?" . . . "I understand that they knew what I call the home port, which is New Orleans.  I understand that they knew that.").

matter of law." *Jefferson Block*, 652 F.3d at 589 (quoting *Sarinsky's Garage*, 691 F. Supp. 2d at 486).    The Court finds that the Hurricane Questionnaire/Plan's provision regarding the "marina or residence where [the] vessel is located between 1st [of] July and 1st of November" means the place where the vessel is to be moored for the majority of the hurricane season.  Gray Group thus represented in the Hurricane Questionnaire/Plan that the HELLO DOLLY VI would be moored at the Orleans Marina for the majority of the time between July 1, 2020 and November 1, 2020.

Having determined the meaning of the location provision, the Court finds that Gray Group breached this provision.  The record establishes that at no point between July 1, 2020 and the vessel's sinking on September 15, 2020 was the HELLO DOLLY VI moored at the Orleans Marina.  Per Gray Group's own admission, the vessel was in Florida the entire time.  It was moved to Fort Lauderdale at some time in the spring, before the start of hurricane season, and was moored at Michael Gray's home in Pensacola from July 19 until Hurricane Sally.[80]  At his deposition, Michael Gray testified that the HELLO DOLLY VI was "docked behind [his] house in Pensacola" except when in transit.[81]  He further testified that he and his family intended to use

---

[80]     R. Doc. 119-6 ¶¶ 3-4 (Declaration of Michael Townsend Gray).
[81]     R. Doc. 119-5 at 27 (Deposition of Michael Gray at 52:9-18).

the vessel to go south to the Florida Keys, Fort Lauderdale, and the Bahamas.[82] Gray Group did not inform Great Lakes that the HELLO DOLLY VI was moored in Pensacola until it sought coverage for the vessel's loss from Hurricane Sally.[83] And although the Hurricane Questionnaire/Plan contemplates that the vessel might be in south Florida during the hurricane season—presumably on a temporary basis—the Questionnaire/Plan makes no mention at all of Pensacola, or of the Gulf Coast near the Florida/Alabama border. For these reasons, Gray Group plainly breached the location provision of the Hurricane Questionnaire/Plan when it spent no time at all in the Orleans Marina, or even in the vicinity of New Orleans, during the 2020 hurricane season.

Gray Group's arguments to the contrary are without merit. First, Gray Group protests that the Policy does not impose "any time limitation on the navigation or mooring locations" of the vessel.[84] While no quantitative time limit appears in the language of the Policy, the Court, in resolving the meaning of the Hurricane Questionnaire/Plan's location provision, has found that the vessel was required to spend a majority of its time during

---

[82]    *Id.* at 41 (Deposition of Michael Gray at 64:24-65:6).

[83]    *Id.* at 27-28 (Deposition of Michael Gray at 52:19-53:2).

[84]    R. Doc. 135 at 9; R. Doc. 119-12 ¶ 8 (Gray Group's Statement of Uncontested and Established Facts).

hurricane season at the Orleans Marina.  As the record makes clear, the HELLO DOLLY VI spent no time at the Orleans Marina during the 2020 hurricane season.

Second, Gray Group argues that the HELLO DOLLY VI was well within its geographic navigation limits, and that it reported its planned navigation to Great Lakes.[85]  But this argument conflates the vessel's navigation with its mooring.  While the vessel is permitted to *travel* to Florida and the Bahamas without running afoul of the Hurricane Questionnaire/Plan, it may not moor for more than two months in these places without breaching the Questionnaire/Plan.

Finally, Gray Group contends that Great Lakes's May 9, 2019 email indicates that there would be an additional premium if the vessel were relocated to the Bahamas, but that there would be no additional premium for a relocation to Florida.[86]  This is a nonsensical reading of the email, which simply does not *mention* whether mooring in Florida would require an additional premium.  Moreover, an earlier line in the email expressly states that the underwriters "rate on the assumption of where the vessel will be for

---

[85]   *See* R. Doc. 135 at 10-14.
[86]   *Id.* at 12.

the majority of the season."[87]  And other emails between the parties further belie the notion that the Bahamas requires an additional premium, while Florida does not.  Most notably, in April of 2020, a few months before the relevant hurricane season, Great Lakes's underwriters wrote that Florida is "included in the *navigation* limits," but that "[i]f [Gray Group] wish[es] to amend *the mooring location* during the hurricane season please provide the full address and we will quote any premium increase."[88]  Far from supporting Gray Group's position, these emails lay bare its awareness that the vessel's sustained presence outside of New Orleans during the 2020 hurricane season was of concern to the insurers, and ran contrary to the existing terms of the Policy.

For all of these reasons, the Court finds that Gray Group breached the Hurricane Questionnaire/Plan's provision that the "marina or residence where [the] vessel is located between 1st [of] July and 1st of November" would be the Orleans Marina.[89]

---

[87]   R. Doc. 25-1 at 27 (Email from Alex Thomas to Alexander Simpson) (May 9, 2019) (emphasis added).

[88]   *Id.* (Email from Alex Thomas to Alexander Simpson) (Apr. 23, 2020) (emphasis added).

[89]   R. Doc. 119-3 at 1 (Hurricane Questionnaire/Plan).

### D.    Effect of Breach

The effect of Gray Group's breach depends on whether the breached terms amount to a warranty under the Policy.  This question is distinct from the already-resolved question of whether the Hurricane Questionnaire/Plan is part of the "application for insurance" and is thereby incorporated into the Policy.  Not every term of a contract constitutes a warranty, breach of which voids the contract.  Under New York law, a warranty is

> any provision of an insurance contract which has the effect of requiring, as a condition precedent of the taking effect of such contract or as a condition precedent of the insurer's liability thereunder, the existence of a fact which tends to diminish, or the non-existence of a fact which tends to increase, the risk of the occurrence of any loss, damage, or injury within the coverage of the contract.

N.Y. Ins. Law § 3106(a).

Here, the location provision of the Hurricane Questionnaire/Plan clearly meets this definition.  The record establishes that the location indicated in application greatly affected the risk that Great Lakes insured, and thus the premium it would require for the insurance.  Furthermore, the Questionnaire/Plan identifies itself as a warranty, stating that the assured "declare[s] that the particulars and answers contained in this form are correct and complete in every respect," and that "this declaration and warranty shall be incorporated in its entirety into any relevant policy of

insurance."[90]   Indeed, Gray Group does not contend that, if the Hurricane Questionnaire/Plan forms part of the Policy, the Questionnaire/Plan is not a warranty.   The Court finds that the Hurricane Questionnaire/Plan is a warranty under the Policy.

Because the Hurricane Questionnaire/Plan constitutes a warranty, Gray Group's breach voids the Policy *ab initio*, both as a matter of New York law, and by the plain terms of the contract itself.   Under New York law, "warranties in maritime insurance contracts must be strictly complied with, even if they are collateral to the primary risk that is the subject of the contract, if the insured is to recover."   *Com. Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 31 (2d Cir. 1999).   As explained by the Second Circuit, "[t]he rule of strict compliance with warranties in marine insurance contracts stems from the recognition that it is peculiarly difficult for marine insurers to assess their risk, such that insurers must rely on the representations and warranties made by insureds regarding their vessels' condition and usage."   *Id*. at 31-32.   Here, Gray Group breached the warranty. Given the marine-insurance standard of strict compliance, the Policy is void, and Gray Group is not entitled to coverage for the loss of the HELLO DOLLY VI.   *See Kephart v. Certain Underwriters at Lloyd's of London*, 427 F. Supp.

---

[90]     *Id.*

3d 508, 517 (S.D.N.Y. 2019) ("Because [the boat owner] breached the . . . terms of the [Hurricane Preparedness Plan], a warranty that must be strictly complied with under maritime insurance law, he is not entitled to coverage under the Policy for damage incurred . . . .").

Furthermore, the Policy itself states that any breach of warranty "will void this policy from inception."[91]  By the plain terms of the contract, then, Gray Group's breach of the Hurricane Questionnaire/Plan voids the Policy.

On a motion for summary judgment in a case to be tried before a judge, rather than a jury, "the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved." *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123-24 (5th Cir. 1978).  The Court finds that a "trial on the merits would reveal no additional data" that would alter the Court's conclusions in this case.  *Id.*  Thus, for the reasons stated above, Great Lakes is entitled to summary judgment, and a declaratory judgment that it does not owe coverage to Gray Group for the loss of the HELLO DOLLY VI.

---

[91]      R. Doc. 119-4 at 14 (Policy).

### E.   Other Claims

Because the Court has found that Gray Group breached the location provision of the Hurricane Questionnaire/Plan, and that this breach voids the Policy and disposes of the case, the Court does not reach Great Lakes's claims that Gray Group breached the Questionnaire/Plan in other ways. Specifically, the Court does not address the parties' evidence regarding whether Gray Group breached the Hurricane Questionnaire/Plan because the vessel (i) was not evacuated to safe harbor, (ii) was not fully manned, and (iii) did not have its anchor dropped.

## IV.   CONCLUSION

The Court GRANTS Great Lakes's motion for summary judgment, and DENIES Gray Group's motion for summary judgment.  The Policy covering the HELLO DOLLY VI is void for breach of warranty.

New Orleans, Louisiana, this __28th__ day of December, 2021.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE